IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FARM CREDIT SERVICES OF AMERICA, FLCA, | ) ) ) | |
| Plaintiff, | ) ) | 8:12CV382 |
| v. | ) ) | |
| MARK OPP, | ) ) | ORDER |
| Defendant. | ) ) ) | |

Now before me is a motion for a preliminary injunction filed by the plaintiff, Farm Credit Services of America, FLCA (FCSA). (ECF No. 17.) FCSA seeks to prevent the defendant, Mark Opp (Opp), from engaging in conduct that violates an "Assignment, Nonsolicitation, and Nondisclosure Agreement" (the Contract). (See id.) A hearing on FCSA's motion was held on December 10, 2012. (See ECF Nos. 40-42.) I have considered the evidence and testimony received at the hearing, along with the briefs submitted by the parties before and after the hearing, and I find that FCSA's motion must be granted. My findings of fact and conclusions of law are set forth below. See Fed. R. Civ. P. 52(a)(2).

**I. FACTS**

FCSA is in the business of selling crop insurance[1] to farmers in South Dakota and other states. FCSA does not underwrite crop insurance policies; rather, it sells policies underwritten by "approved" crop insurance providers. According to Michael Barrett, a senior vice president at FCSA, there are sixteen different approved crop insurance providers, and all of them accept customers from South Dakota. FCSA does business with only five of the sixteen providers, however.

---

[1] Crop insurance provides protection for farmers against natural perils that cause yield or revenue losses.

FCSA employs a number of registered agents[2] to sell crop insurance policies on its behalf, service the policies after they are sold, and promote FCSA's business. There are approximately 1,200 licenced crop insurance agents in South Dakota, and farmers in the state can work with any of these agents to obtain crop insurance. Given the evidence in the record, I find that crop insurance sales may fairly be characterized as a competitive business in South Dakota.

FCSA's agents' policy-servicing duties include answering customers' questions about their policies; working with customers to complete policy renewal and claims forms; obtaining acreage reports, which document the number of acres planted by customers; and obtaining production reports, which document the size of the customers' yields after harvest. Its agents' other responsibilities include meeting the sales and customer retention goals established by the FCSA's regional offices, or "Marketplaces."

The work performed by FCSA's agents follows a twelve-month cycle driven by deadlines established under the United States Department of Agriculture's crop insurance program. There are two crop insurance sales seasons in South Dakota, and each is subject to a different set of deadlines. The fall sales season, which mainly involves crop insurance for forage and winter wheat, revolves around a September 30 deadline for insurance sales. The focal point of the spring sales season, which involves insurance for most of the crops grown in the state, is the March 15 deadline for insurance sales.[3] After these deadlines pass, a farmer who has obtained crop insurance cannot move to a different insurance company during that season. Barrett provided conflicting testimony about the need for FCSA's agents to renew its customers' crop insurance policies. On the one hand, he said that the policies are "continuous," meaning that they continue year after year unless the farmer elects to change or cancel the policy. He also said, however, that the agents must renew customers' policies each year. In any event, it is clear that policy renewals and/or changes are subject to

---

[2] Barrett, who leads FCSA's insurance business unit, testified that the unit has 200 employees in it. He did not say how many of these employees are agents, and he did not say how many of them work in South Dakota.

[3] Other deadlines that apply to the spring season are July 15, which is the deadline for acreage reports, and April 30, which is the deadline for production reports.

insurance sales deadlines for each season, and FCSA's agents must operate within the framework established by these deadlines.

Opp began working as a registered agent for FCSA in 2008. Prior to joining FCSA, Opp had many years of experience in the field of crop insurance claims adjusting, but he had no experience in crop insurance sales. (See Ex. 12.) FCSA provided Opp with training, (see Ex. 4), and helped him to satisfy licensing and continuing education requirements. Also, because Opp did not bring customers with him to FCSA, FCSA assigned him a set of policies to service. In addition, FCSA helped Opp develop goodwill with customers by arranging opportunities for him to meet with existing and prospective customers, providing him with the use of a vehicle, and covering meals and other expenses that Opp incurred while building customer relationships (see Ex. 5).

Opp became the "primary contact" for a number of FCSA's customers. As the primary contact, Opp took the lead role in ensuring that his customers' needs were met and that their coverage was kept in place. Opp also renewed customers' policies, obtained acreage and production reports, assisted with the filing of claims, and attempted to meet the sales and retention goals established by his office. In the course of his duties, Opp conferred with his assigned customers three or four times per year as various annual deadlines arose. Opp was able to develop personal relationships with his customers and earn their loyalty.

FCSA calculates its percentage share of the total market for crop insurance in specific regions (i.e., market share) by comparing the number of acres that it insures with the total number of insured acres published in a report issued by the Risk Management Agency, which is a division of the United States Department of Agriculture. Opp worked in FCSA's Aberdeen office, which lies within the Watertown Marketplace. According to FCSA's calculations, in 2012 the Watertown Marketplace had a 10.7% market share, and the Aberdeen office had an 8% market share. (See Ex. 17.) Opp did not have personal contact with all of FCSA's Watertown Marketplace customers, but the percentage of FCSA's Watertown Marketplace customers who worked with Opp is not in evidence.

All of FCSA's crop insurance agents are required to sign an Assignment, Nonsolicitation and Nondisclosure Agreement as a condition of their employment. The version of the agreement that was signed by Opp (i.e., the Contract) states, in pertinent part,

3

> 2. NONSOLICITATION OF CUSTOMERS. For a period of one year following the termination (voluntary or involuntary, for any or no reason) of Employee's employment with [FCSA], Employee shall not, directly or indirectly, sell, solicit, support, direct, manage or otherwise have any involvement whatsoever in the sale, marketing, or solicitation of any customer of [FCSA] with whom Employee actually did business and had personal contact while employed by [FCSA], except to the extent such activities are unrelated to and not competitive with the business, products or services that Employee offered or provided on behalf of [FCSA] and cannot adversely affect [FCSA]'s relationship or volume of business with such customers.

(Ex. 2 at 1.) Barrett testified that Opp would not have been hired, trained, or given access to customers if he had not signed the Contract. He also testified that because of the time, energy, and resources that FCSA invests in developing its agents, and because its business depends heavily on the relationships between its agents and its customers, FCSA requires its agents to agree to the foregoing term so that FCSA can have a "fair shot" at retaining customers whenever an agent leaves the company. Barrett added that the one-year non-competition period not only reflects the twelve-month cycle of the crop insurance business, but also allows FCSA time to train a new agent and introduce him to its customers without competition from former agents who, with FCSA's assistance, have already developed relationships with those same customers.

FCSA did not find any problems with Opp's work during the first years of his employment. Eventually, however, FCSA directed Opp to follow a performance improvement plan. The plan required Opp to increase his sales and generate new business sufficient to meet the goals set by the leader of his office. Sometime later, on or about May 17, 2012, FCSA terminated Opp's employment. (See Ex. 3.) It then reassigned Opp's customers to different agents. (See Ex. 10.)

Opp has lived in Eureka, South Dakota, throughout his entire life. Although he was assigned to the Aberdeen office during his employment with FCSA, Opp worked out of Eureka during most of the week and spent the remainder of his time traveling between the Mobridge and Aberdeen offices. Because of his parent's health problems, Opp is reluctant to leave Eureka to obtain new employment, and there are few employment prospects in town.[4] Opp testified, however, that he did not look for a job after his termination from FCSA because he received four weeks of vacation pay

---

[4] Opp testified that the population of Eureka is approximately 850.

4

and six weeks of unemployment benefits. He also indicated that he would consider taking a job outside Eureka if his employer provided him with a vehicle or reimbursed his expenses.

At some point following his termination, some of Opp's former customers at FCSA contacted him and asked him why he was no longer working for FCSA. They also asked Opp questions about their insurance policies and complained to him about FCSA. Opp responded to these questions and complaints by referring the people back to FCSA. Even so, they continued to bring questions and complaints to Opp.

Sometime during May or June 2012, Opp discussed the terms of his FCSA Contract with an attorney in Sioux Falls named Brian Kirby. Then in June 2012, Opp incorporated his own crop insurance sales company, "Opp Ag." Opp is the president and the sole owner of Opp Ag, and he is the only crop insurance salesperson employed by the company. Opp published advertisements for Opp Ag, and after seeing these advertisements some of his former customers asked Opp to transfer their business away from FCSA. When these customers approached him, Opp sometimes commented that "the expertise didn't exist" at FCSA since he was terminated, and he used documents prepared by Kirby to obtain declarations from the customers stating that they were soliciting Opp "of [their] own free will and that Mr. Mark Opp did not directly solicit [their] business." (See Ex. 11.) After the customers signed this declaration, Opp transferred the customers' fall and spring crop insurance policies from FCSA to Opp Ag.

With one exception, all of Opp Ag's crop insurance customers are former FCSA customers with whom Opp did business and had personal contact during his time at FCSA. In all, Opp moved 24 of his former FCSA customers to Opp Ag. (See Ex. 7.)[5] For ease of reference throughout the remainder of this memorandum, I shall refer to Opp's former FCSA customers who transferred to Opp Ag as "the transferred customers." Since forming Opp Ag, Opp has not attempted to pursue any new customers who were not already customers of FCSA. Also, all of the transferred customers moved from FCSA to Opp Ag within one year of Opp's termination from FCSA. Indeed, one year has not yet passed since Opp's termination.

---

[5] All of the customers with whom Opp did business and had personal contact during his employment at FCSA are listed in Exhibit 10.

Opp maintains that after he and other agents departed from FCSA at approximately the same time,[6] FCSA's customers grew dissatisfied with FCSA. He adds that this dissatisfaction drove the customers to seek him out. He also maintains that he only moved customers from FCSA to Opp Ag after making several attempts to persuade the customers to submit their complaints to FCSA.

Because of the deadlines imposed under the crop insurance program, the fall crop insurance contracts that Opp transferred to Opp Ag from FCSA cannot now be transferred away from Opp Ag. The March 15 deadline for spring crop insurance sales has not yet lapsed, however. Therefore, time remains for the transferred customers to purchase insurance for spring crops from someone other than Opp.

Based on a three-year trend analysis of its entire book of business across three states, FCSA averages $5 per acre in commission income for its sales of fall and spring crop insurance policies. On cross-examination, however, Barrett conceded that the fall crop insurance contracts generate far less than $5 per acre in commission income. He also conceded that it cannot be known whether the transferred customers would have moved their business away from FCSA without Opp's actions, nor can it be known whether the transferred customers would increase or decrease the number of their insured acres in the future. Indeed, because the spring crop insurance sales deadline has not yet passed, it is not clear whether any of Opp's customers will remain with Opp, transfer their business back to FCSA, or transfer their business elsewhere. Nevertheless, Barrett estimates that if Opp's actions caused FCSA to lose 20,000 acres of both fall and spring crop insurance business, its commission losses would be approximately $100,000.

## II.   ANALYSIS

FCSA seeks an injunction that precludes Opp from "servicing the spring crop insurance policies in 2013" for the transferred customers and from "soliciting or working with any [FCSA] customer with whom he did business and had personal contact while employed at [FCSA]." (Pl.'s Post Injunction Hr'g Br. at 21, ECF No. 44.)

---

[6] Four employees (including Opp) left FCSA's Watertown Marketplace for various reasons within approximately two years.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist., 696 F.3d 771, 776 (8th Cir. 2012) (quoting Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "A court should balance these considerations when deciding whether to issue an injunction," Mid-America Real Estate Co. v. Iowa Realty Co., Inc., 406 F.3d 969, 972 (8th Cir. 2005) (citation omitted), and "[i]n balancing the equities no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113. It should be noted, however, "that the failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction,'" Blue Moon Entertainment, LLC v. City of Bates City, Mo., 441 F.3d 561, 564 (8th Cir. 2006) (citation omitted), and that "an injunction cannot issue if there is no chance of success on the merits," Mid-America Real Estate Co., 406 F.3d at 972 (citations omitted).

Also, I may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

### A. The Threat of Irreparable Harm to the Movant

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist., 696 F.3d 771, 778 (8th Cir. 2012) (quoting Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 706 (8th Cir. 2011)). An injunction should not issue if it is too late to prevent any potential harm, nor should it issue if the future harm is speculative. See id. at 779.

I find that FCSA has demonstrated a threat of irreparable harm. Opp concedes that he has transferred his former FCSA customers away from FCSA and to his own company, and the loss of customer goodwill represents the sort of injury that cannot fully be compensated through an award of damages alone. See, e.g., Rogers Group, Inc. v. City of Fayetteville, Ark., 629 F.3d 784, 789-90 (8th Cir. 2010). Opp also testified that he has transferred the customers' fall and spring crop insurance policies from FCSA to Opp Ag. While the monetary loss that FCSA has suffered due to

these transfers is difficult to quantify at this time, I am persuaded that the loss is neither speculative nor insignificant. Also, although it is too late for an injunction to remedy Opp's transfer of the fall policies, time remains for customers to change their spring policies from Opp Ag to another company. In short, the evidence shows that there is a clear and present need for equitable relief to address imminent, significant, and certain harm to FCSA.

**B.    The Balance Between the Threat of Harm to the Movant and the Injury that Granting the Injunction Would Inflict on the Defendant**

After careful consideration, I find that the balance between the threat of harm to FCSA and the injury that granting an injunction would inflict on Opp weighs in favor of issuing the injunction.

As I noted in the preceding section of this memorandum, FCSA faces imminent, significant, and certain harm to its business, and there is a clear need for an injunction to address this harm. On the other hand, if Opp is enjoined from servicing the transferred customers' spring crop insurance policies in 2013, Opp Ag will lose nearly all of its present customers. Also, if Opp is enjoined from working with any customers with whom he did business and had personal contact during his employment at FCSA, his ability to obtain new customers will be hindered. Thus, the issuance of an injunction would have a serious, immediate impact upon Opp's business. Nevertheless, I note that Opp has not yet made any effort to acquire business from new customers; to date, he has simply relied on the customer relationships that he forged during his time at FCSA to develop Opp Ag's book of business. Furthermore, even if I assume that Opp did business and had personal contact with all of FCSA's Watertown Marketplace customers during the course of his employment at FCSA, FCSA's market share is not so great that Opp's ability to obtain new customers will be affected significantly. Indeed, in 2012 nearly 90% of the insured acres in the Watertown Marketplace area were insured through someone other than FCSA.

Although I am mindful that the issuance of an injunction would cause Opp Ag to lose virtually all of its current business, Opp's ability to compete fairly for new business would not be greatly affected. The harm that FCSA has suffered due to Opp's actions outweighs the harm that Opp would face if he were prohibited from exploiting the goodwill and business relationships that he developed for FCSA.

### C. The Probability that the Movant Will Succeed on the Merits

The likelihood of success on the merits is the most significant factor in my analysis. See S.J.W. ex rel. Wilson v. Lee's Summit R-7 School Dist., 696 F.3d 771, 776 (8th Cir. 2012) (quoting Minnesota Association of Nurse Anesthetists v. Unity Hospital, 59 F.3d 80, 83 (8th Cir. 1995)). This factor weighs heavily in favor of the issuance of a preliminary injunction.

FCSA argues that the Contract's "Nonsolicitation of Customers" paragraph prohibits Opp from soliciting, doing business with, or selling crop insurance to customers with whom he did business and had personal contact during his employment at FCSA. Thus, in FCSA's view, it is irrelevant whether the transferred customers approached Opp first or Opp solicited them first: in either case, Opp violated the Contract when he transferred their business from FCSA to Opp Ag. Opp responds that he did not violate the Contract because he did not solicit the transferred customers, but merely accepted their business after the customers approached him. Opp also notes that prior to incorporating Opp Ag, he made efforts to direct these customers back to FCSA.

To resolve the parties' disagreement about the Contract's requirements, I turn to the plain language of the Contract itself. The relevant portion of the Contract is poorly worded. It states in part that Opp cannot "sell . . . or have any involvement whatsoever in the sale [or] marketing . . . of any customer of [FCSA] with whom [Opp] actually did business and had personal contact with while employed by [FCSA] . . . ." (Ex. 2 at 1 (emphasis added).) Thus, when read literally, the Contract does not clearly state that Opp cannot sell to certain customers or engage in marketing to certain customers; it states that Opp cannot "sell . . of any customer" or have involvement "in the sale [or] marketing . . . of any customer." (Id. (emphasis added).) The Contract goes on to clarify, however, that Opp is not prohibited from "activities [that] are unrelated to and not competitive with the business, products or services that [Opp] offered or provided on behalf of [FCSA] and cannot adversely affect [FCSA]'s relationship or volume of business with such customers." (Id.)

For the purposes of my analysis, I shall assume that this portion of the Contract is ambiguous as a matter of law because its grammatical shortcomings render it susceptible of two reasonable but conflicting interpretations (i.e., it either does or does not prohibit Opp from selling crop insurance to customers with whom he did business and had personal contact during his employment at FCSA). The interpretation of the ambiguous portion of the Contract is a matter for the trier of fact to resolve.

9

It seems to me, however, that for two reasons, a reasonable trier of fact is unlikely to interpret the Contract to mean that Opp is permitted to sell crop insurance to the customers at issue. First, FCSA is not in the business of selling or marketing customers; it sells crop insurance to customers. Thus, a literal reading of the Contract (i.e., that it prohibits sales <u>of</u> customers instead of sales <u>to</u> customers) would render its references to sales meaningless, and I doubt that the trier of fact will interpret the Contract in such a way. Second, when the "Nonsolicitation of Customers" paragraph is read as a whole, it is quite plain that Opp agreed not to compete with FCSA for customers with whom he worked directly during his employment at FCSA. A simple grammatical correction (i.e., the insertion of the word "to" following the words "sell," "sale," and "marketing") would eliminate the ambiguity in a manner that is consistent with the remainder of the Contract and avoid creating a loophole that would essentially nullify the entire provision. In short, I find that the trier of fact will probably reject Opp's argument that the Contract leaves him free to sell crop insurance to, or service crop insurance policies for, his former FCSA customers if he simply avoids soliciting them first.

Furthermore, the Contract <u>does</u> clearly and unambiguously prohibit Opp from directly or indirectly soliciting, or having any involvement whatsoever in the marketing or solicitation, of any customer with whom Opp did business and had personal contact while employed by FCSA. Opp testified that he published advertisements for Opp Ag, that customers with whom Opp did business and had personal contact during his time at FCSA responded to his advertisements, and that Opp then transferred their business from FCSA to Opp Ag. These admissions establish that Opp did solicit his former FCSA customers in violation of the Contract, and therefore FCSA is virtually certain to prevail on the merits of its claim.

Opp claims that his use of the documents prepared by Kirby allows him to escape the Contract's anti-solicitation provision. As I noted previously, these forms state that the transferred customers "solicited Mr. Mark Opp of [their] own free will and that Mr. Mark Opp did not <u>directly</u> solicit [their] business." (<u>See</u> Ex. 11 (emphasis added).) Opp's testimony establishes, however, that Opp did solicit the transferred customers's business by publishing advertisements that induced them to request transfers to Opp Ag. It is irrelevant whether these advertisements are deemed "direct" or "indirect" solicitation, because the Contract prohibits Opp from engaging in either type of solicitation of these customers.

Opp also argues that the Contract's non-competition provision is unenforceable because 1) it is "injurious to the public," and 2) FCSA acted abusively and with bad faith toward Opp. (See Def.'s Br. in Opp'n to Pl.'s Mot. for Prelim. Injunction at 8-10, ECF No. 23; see also Def.'s Br. in Opp'n to Issuance of Prelim. Injunction at 1-3, ECF No. 43.) These arguments are not persuasive.

"In determining whether a covenant not to compete is valid, a court considers whether the restriction is (1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee." Aon Consulting, Inc. v. Midlands Financial Benefits, Inc., 748 N.W.2d 626, 638 (Neb. 2008) (footnote omitted).

First, Opp argues that the Contract's non-competition provision is injurious to the public because "it would prohibit members of the South Dakota public from doing business with any employer of Defendant Opp." (Def.'s Br. in Opp'n to Pl.'s Mot. for Prelim. Injunction at 9, ECF No. 23.) This is not accurate. The Contract does not prohibit customers "from doing business with any employer of Defendant Opp." It merely prohibits Opp himself from doing certain types of business with customers with whom he worked and had personal contact during his time at FCSA. Furthermore, given the number of agents and underwriters engaged in the crop insurance business in South Dakota, it is difficult to see how any crop insurance customers will suffer a significant injury if Opp is unable to work with them until after May 17, 2013. Also, ample time remains for the transferred customers to move their business from Opp Ag to one these other agents prior to the spring sales deadline. The non-competition provision is not injurious to the public.

Second, FCSA has a legitimate interest in protecting itself against unfair competition from its former agents. "To distinguish between 'ordinary competition' and 'unfair competition,' [the Nebraska Supreme Court has] focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers." Aon Consulting, Inc., 748 N.W.2d at 638 (footnote omitted). "Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair and the employer has a legitimate need for protection against the employee's competition." Id. (footnote omitted). The Contract does not prevent Opp from engaging in

"ordinary competition" with FCSA; rather, it temporarily prevents him from performing crop insurance sales-related work for those customers with whom he did business and had personal contact during his employment with FCSA. In other words, Opp is free to sell crop insurance for, and service crop insurance policies sold by, any company – including Opp Ag – as long as he does not compete unfairly with FCSA during the first year following his termination. I find that the Contract's non-competition provision is not greater than reasonably necessary to protect FCSA's legitimate interest in retaining the goodwill of its customers.

Finally, the non-competition provision is not unduly harsh or oppressive to Opp. It is effective for only one year following Opp's termination, and it restricts Opp from doing business with only a small fraction of the potential customers in the area surrounding Opp's home.

Opp argues that the Contract is oppressive because he was terminated without cause despite being a "faithful employee," and he emphasizes that he attempted to fulfill the Contract "by repeatedly sending inquiring customers back to [FCSA]." (Def.'s Br. in Opp'n to Issuance of Prelim. Injunction at 3, ECF No. 43.) Opp also argues that the transferred customers would have left FCSA for some other company even if Opp did not transfer their business to Opp Ag. (Id.) There has been no suggestion that Opp's termination was unlawful, and in any event I fail to see how the circumstances of his termination might render the Contract unenforceable. Also, although it is true that Opp initially referred his former customers back to FCSA, he soon began to transfer their business from FCSA to his own new company in violation of the Contract. Opp's claim that the customers were disgruntled and would have left FCSA without Opp's interference is simply not relevant. The transferred customers did not leave FCSA for some other company: they left FCSA for Opp Ag due to Opp's "siphoning away" of FCSA's goodwill.

In summary, I conclude that the Contract's non-competition provision is valid and enforceable, and FCSA is quite likely to prevail on its claim that Opp violated the terms of that provision.

### D. The Public Interest

In the foregoing section of this memorandum, I explained that the non-competition provision is not injurious to the public. For similar reasons, I find that the issuance of a preliminary injunction would not harm the public interest. Although the injunction would have the effect of forcing the

transferred customers to find a new agent to handle their 2013 spring crop insurance business, there is ample time for them to make this change, and there is no shortage of agents with whom they may work.

After carefully considering the foregoing factors, I conclude that all of the equities weigh in favor of the issuance of a preliminary injunction in this case.

### E. Security

FCSA argues that a bond in the amount of $5,000.00 would constitute proper security to support the issuance of the injunction. It states, "Opp testified that he has commissions at stake of four to five thousand dollars for the policies he transferred for the fall which makes this sum appropriate for a bond." (Pl.'s Post Injunction Hr'g Br. at 20, ECF No. 44.) It adds that FCSA "easily has the wherewithal to satisfy any claimed damages" if it is later determined that the preliminary injunction should not have issued. (Id.)

I am not persuaded that a bond in the amount of $5,000.00 would be sufficient to pay Opp's costs and damages if it is later determined that he has been wrongfully enjoined. The fall crop insurance policies will not be affected by this injunction; thus, the amount of money associated with those policies does not have any relationship with the losses that Opp will incur if he is restrained from servicing the transferred customers' spring 2013 crop insurance policies. The precise amount in controversy is somewhat uncertain at this time, but FCSA has argued that the commissions associated with the transferred customers' spring policies total approximately $100,000.00. Thus, Opp is likely to sustain approximately $100,000.00 in damages if he is wrongfully enjoined. I find, therefore, that FCSA must give security in the amount of $100,000.00 before the injunction will issue.

**IT IS ORDERED** that:

1. Because FCSA has shown that the balance of the equities favor the issuance of a preliminary injunction to prevent Mark Opp from continuing to violate the parties' non-competition agreement, FCSA's motion for a preliminary injunction, (ECF No. 17), is granted.

2. The defendant, Mark Opp, shall not serve as an agent in connection with any spring 2013 crop insurance policy that is or may yet be held by any of the crop insurance customers with whom he did business and had personal contact during his employment at FCSA. To the extent that such persons have already placed 2013

        spring crop insurance business with him, Mark Opp must cease to do business with them immediately and direct them to transfer their business to another agent.

3.      Also, Mark Opp shall not sell crop insurance to, or solicit for the purpose of selling crop insurance to, any of the people with whom he did business and had personal contact during his employment at FCSA until one year has passed from the date of his termination.

4.      The preliminary injunction is conditioned upon FCSA providing good and sufficient bond or other approved security in the sum of $100,000.00.

Dated February 4, 2013.

        BY THE COURT

        */s/ Warren K. Urbom*

        Warren K. Urbom
        United States Senior District Judge